Filed 4/25/23 Thomas v. City of Los Angeles

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| MALCOLM THOMAS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LOS ANGELES,<br><br>Defendant and Appellant. | B305051<br>(c/w B308622)<br><br>(Los Angeles County<br>Super. Ct. No. BC416182) |

APPEALS from a judgment and an order of the Superior Court of Los Angeles County. Victor E. Chavez, Judge. Affirmed.

Shegerian & Associates, Inc., Carney R. Shegerian and Jill McDonell for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Deputy City Attorney, Scott Marcus, Chief Assistant City Attorney, Blithe S. Bock, Managing Assistant City Attorney, and Michael M. Walsh, Deputy City Attorney, for Defendant and Appellant.

_____

Plaintiff Malcolm Thomas (Thomas), a former employee of the Los Angeles Police Department (LAPD), brought a Fair Employment and Housing Act (FEHA) action against defendant City of Los Angeles (the City), alleging six causes of action. The matter was originally tried in July 2010, with a defense verdict on all causes of action except the claim for disability discrimination; the jury found in favor of Thomas on that cause of action. The City successfully appealed. On December 6, 2012, we reversed the judgment in favor of Thomas and remanded the matter for a new trial on Thomas's disability discrimination claim. In July 2019, the matter was retried. The jury again found in favor of Thomas, awarding him $1,014,000. The trial court later awarded Thomas attorney fees in the amount of $2,311,662.50 and costs of $272,270.01.

On appeal, the City argues: (1) Because Thomas was not a qualified person, he failed to present a prima facie disability discrimination case; (2) Jury misconduct requires a new trial; and (3) The trial court awarded Thomas excessive attorney fees.

We affirm.[1]

---

[1] Thomas also filed a protective cross-appeal. According to his appellate brief: "In this protective Cross-Appeal, Thomas asks that the Court reverse the Trial Court's October 3, 2018, Order, granting [the City's] Motion to Dismiss claims under Thomas's 2012 complaint pursuant to the three-year and five-year statutes, *only if* this Court reverses the judgment pursuant to [the City's] appeal." We presume Thomas is referring to the trial court's October 10, 2018, order; on October 3, 2018, the trial court took the City's motion to dismiss under submission. In any event, since we are affirming the judgment, we need not reach the issues raised in the cross-appeal.

## FACTUAL[2] BACKGROUND

### I. *Thomas's employment with LAPD*

Thomas began working as an LAPD police officer in May 1997, then worked for the District Attorney's Office, returning in February 2007 and transferring to the training division in September 2007. He trained extensively and worked as an instructor in ARCON/PT,[3] assisting primary instructors teaching recruits and teaching classes to in-service officers getting recertified.

### II. *Thomas injures his knee*

On May 9, 2008, during a training session, Thomas tore his left knee medial meniscus and injured his back.

On Monday, May 12, 2008, Thomas provided a doctor's note to his supervisor, Sergeant Christopher Costley (Costley), informing LAPD that Thomas's physical restrictions included no squatting, kneeling, running, jumping and limited use of knee.[4]

---

[2] We review the record in the light most favorable to the judgment. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) Because the City only challenges one element of Thomas's discrimination claim (whether he was a qualified individual), we limit our discussion of the detailed facts to those pertaining to that contention.

[3] Arrest and Control/Physical Training unit.

[4] Part of Thomas's disability discrimination claim was that Costley disregarded these restrictions.

III. *Thomas undergoes knee surgery and then returns to work with restrictions*

A. <u>Surgery</u>

On June 30, 2008, Thomas underwent knee surgery, which required months of recovery.

B. <u>LAPD policies regarding returning injured officers to work</u>

The LAPD has two statuses for officers returning from injury, temporary and permanent. If a doctor places temporary medical restrictions on an LAPD officer, the officer can work if it does not violate his restrictions. The LAPD has an obligation to return injured workers back to work without violating restrictions. "There's a lot of inside jobs that the department has to accommodate people who are light duty." For example, Captain Michelle M. Veenstra (Veenstra) testified that Thomas could have worked with restrictions in her office. From 2008 to 2009, the LAPD had a number of officers working day-to-day desk jobs, which included Police Officer II (Thomas's position).

Former Assistant LAPD Chief Sandy Jo MacArthur (MacArthur) testified that returning to active duty, not full duty, is the LAPD's concern regarding injured officers; LAPD would like them to come back and actively participate in light duty. Officers are not expected to perform like full duty officers when they are on light duty.

C. <u>Thomas's return to work; Costley's failure to comply with LAPD policy and the medical restrictions</u>

Thomas spoke with Costley twice postsurgery while on leave. First, he called and said he would be returning with strict restrictions; Costley said to get longer time off from his doctor because there was not much to do "'unless you're full-go.'" Later,

when Thomas reported that he still had strict restrictions and provided LAPD with a doctor's note detailing the restrictions, Costley responded, "'We'll put you on the fourth floor,'" the administrative floor.

In the October 13, 2008, duty certificate that Costley created using Thomas's doctor's note, Costley wrote, "[s]edentary work only" after returning from surgery.

Thomas returned to work on October 15, 2008. But, he never worked fourth floor administrative, and his work was not sedentary. Instead, he worked his normal duties as an assistant instructor, helping teach recruit classes and demonstrating techniques, but not going on runs. Thomas discussed his restrictions with Costley and requested projects that would be sedentary; Costley said, "'I'll let you know.'"

D. <u>Thomas notifies Veenstra of discrimination and/or harassment</u>

Thomas felt that Costley was not recognizing his restrictions by not placing him on the fourth floor and expecting him "to go out there with the recruits." Thus, on November 10, 2008, Thomas notified Veenstra of disability discrimination and/or harassment.

E. <u>Thomas gives Costley a November 11, 2008, doctor's note; he is placed on medical leave (Nov. 12, 2008)</u>

On November 11, 2008, Thomas obtained a doctor's note from Dr. Emmett Cox II, an orthopedic surgeon and the agreed medical examiner, that returned Thomas to work on modified duty. The following day, he gave that note to Costley; Costley responded angrily. He told Thomas: "'Veenstra told me to give you a project,'" his first time offering administrative duties to Thomas. Costley was "visibly upset" at roll call and looked at

5

Thomas, stating, "[W]e're all adults here. If you have a problem fix it yourself.'" After roll call, no one spoke to Thomas; they turned their backs on him, which was not normal.

After work that day, Thomas went to his primary care doctor, Dr. Amanuel Sima, because he was anxious, headachy, and suffering from irregular breathing. He was placed on leave until December 26, 2008, for multiple medical conditions.

On November 13, 2008, Costley received Dr. Sima's note.

IV. *Meanwhile, Thomas begins mental health treatment*

From October 2008 through January 2009, Thomas had varying levels of depression.

A. Dr. Adam Herdina

Starting on October 30, 2008, Thomas began obtaining treatment from Dr. Adam Herdina, a police psychologist.

Dr. Herdina saw improvement in February/March of 2009, which he attributed to Thomas being away from work. At no time did he opine that Thomas's police powers should be removed.

B. Dr. Rodney D. Collins

On November 24, 2008, psychiatrist Dr. Collins began treating Thomas. On January 29, 2009, Dr. Collins issued a stay away order to the LAPD, advising Thomas's supervisors and the LAPD as a whole to cease contact with Thomas.

After 60 days, Thomas improved, so on March 28, 2009, Dr. Collins issued a release to return to work.[5] Dr. Collins did not believe that Thomas's ability to be a police officer was restricted at that time.

---

[5] His office's standard practice is to fax these notes to the employer.

6

Dr. Collins verbally informed Thomas of this release within a few days of its transmittal to Thomas's employer.

After his conversation with Dr. Collins, Thomas informed Sarah Richardson (Richardson), an investigator with the Inspector General's Office, that his "psych" had cleared him. On April 24, 2009, Richardson e-mailed Detective Christopher Leo Casey (Casey) and then-Sergeant Timothy Nordquist (Nordquist) at Internal Affairs that Thomas "stated that he had been cleared by the psychologist."

Casey explained that even though Thomas had been "cleared," that assessment had to go through the LAPD "Medical Liaison" so that LAPD could trust and verify that the officer could return to work. But, Casey did nothing in response and was unaware if LAPD followed up on it.

V. *LAPD's investigation into Thomas's discrimination complaint*

Eventually, the LAPD launched an investigation into Thomas's discrimination complaint. Nordquist led the investigation and submitted his report to the adjudicator, Captain Don Schwartzer, who identified no misconduct.

VI. *Thomas's police powers are suspended*

A. Suspension of police powers

On April 6, 2009, Thomas's police powers were removed.[6]

Veenstra notified Thomas: "Your peace officer status shall remain suspended until you are returned to full and active

---

[6] At trial, Nordquist testified that the removal of police powers including badge and gun constitutes an adverse employment action.

7

duty,"[7] directing him to relinquish his duty weapon and identification, "[b]ased on your medical condition, the Department hereby withdraws your authority to act in the capacity as a peace officer."

VII. *Thomas is cleared to return to work*

A. <u>Conflicting evidence regarding when Thomas was cleared to return to work</u>

There was conflicting evidence regarding when Thomas was cleared to return to work. On July 2, 2008, Dr. Ronald E. Glousman, Thomas's surgeon, notified LAPD that Thomas was "temporarily totally disabled for 6 weeks." But on July 31, 2008, Dr. Glousman reported that Thomas could return to work that date with certain physical restrictions.

A September 8, 2008, treatment and disability information form completed for Thomas's workers' compensation claim indicated that he could return to work on restricted duty only effective that date. But, another treatment and disability information form, also dated September 8, 2008, indicated that Thomas was temporarily totally disabled until October 13, 2008.

As set forth above, Dr. Cox returned Thomas to work on modified duty on November 11, 2008. In other words, as Dr. Cox explained at trial, Thomas could have performed his job with

---

[7] MacArthur testified that the letter's reference to "full duty" was not necessary and an oversight because officers return and work light duty; MacArthur would not have put "full duty" in the letter because LAPD's concern is active duty, even if light. Although she signed it, Veenstra could not explain why the letter referenced full duty, because Thomas did not have to come back full duty.

accommodations; he could be a police officer who performed administrative or sedentary work. While Dr. Cox testified that Thomas could not return to work as a patrolman, he also attested that Thomas could return to a police position that did not involve hand-to-hand combat.

Dr. Collins issued a release for Thomas to return to work on March 28, 2009. Dr. Sima cleared Thomas to return to work on May 24, 2009.

Dr. Douglas Jackson, an orthopedic surgeon, signed a workers' compensation document authorizing Thomas to return to work as a police officer as of August 14, 2009.

Dr. Robert Wilson, an orthopedic surgeon, offered expert testimony that by 2009, Thomas would have been cleared to return to full activities.

Thomas also saw Dr. Yuan in 2009. In May, Dr. Yuan placed him off work for six weeks. On August 27, he indicated that Thomas was to remain off work for four weeks because of back pain.

Derwin Henderson (Henderson) of the return to work section[8] opined that Thomas's restrictions did not allow him to return to work until 2016.

---

[8]    The return to work section finds reasonable accommodations for employees with permanent and temporary work restrictions. Donna Baylosis (Baylosis) testified that the return to work section does not handle situations where an officer brings his supervisor a light duty notice and the officer can be accommodated by the division. However, if the training division could not accommodate a light duty, the return to work section would step in and assist.

B. Conflicting evidence regarding whether Thomas had to return to work full duty

Thomas believed that he had been cleared to work with restrictions, i.e., light duty. But, Thomas understood from the LAPD that he was required to return to full duty, making light duty not an option. After all, before he returned to work after his surgery, Costley told him not to return "'unless you're full-go.'" Veenstra's April 6, 2009, letter also said so. And, two employees with the return to work section, Baylosis and Henderson, advised Thomas that he was required to return to full duty. Thomas was never told that he did not have to return to work full duty in 2009.

According to Veenstra, removal of his police powers did not prevent Thomas from returning to work. She testified: "[A]ll he had to do was come back with a doctor's note putting him back to full duty—coming back, and . . . I have to correct. [¶] He doesn't have to come back full duty. He could come back light duty like he did prior. [¶] . . . [T]hen at that time everything would be reevaluated." In fact, LAPD had officers who worked in administration. And officers in the training division do not make arrests.

**PROCEDURAL BACKGROUND**

I. *The complaint; first trial; appeal; remand for new trial*

In June 2009, Thomas initiated this lawsuit against the City, alleging claims for (1) workplace harassment in violation of FEHA; (2) retaliation in violation of FEHA; (3) failure to investigate in violation of FEHA; (4) disability, racial, and sexual orientation discrimination in violation of FEHA; (5) retaliation in violation of statutory policy; and (6) declaratory and injunctive relief.

10

The matter proceeded to a jury trial in July 2010, with the jury returning a verdict in favor of Thomas on the sole claim of disability discrimination. The City successfully appealed. Finding prejudicial error in the trial court's jury instructions, we reversed the judgment and remanded the matter for a new trial on that lone cause of action.[9] (*Thomas v. City of Los Angeles* (Dec. 6, 2012, B229265) [nonpub. opn.].)

II. *Three new trials on the remanded disability discrimination claim*

In October 2014, the trial court retried the remanded disability discrimination cause of action. A mistrial occurred.

Thereafter, a new trial on the remanded disability discrimination claim commenced in April 2015, but the jury could not reach a verdict.

The third retrial began in July 2019.[10]

III. *Jury instructions*

As pertains to the issues in this appeal, the jury was given joint instructions as filed by the parties. These instructions included CACI No. 2543, which defines "'Essential Job Duties'"

---

[9] While the City's appeal was pending, Thomas initiated a second lawsuit against the City in 2012 (*Thomas II*). The parties later stipulated to dismiss *Thomas II* without prejudice, with Thomas filing a supplemental complaint in the instant action, adding each of the causes of action in *Thomas II* to the disability discrimination claim. On October 10, 2018, the trial court dismissed those claims that were originally pleaded in *Thomas II*. Thus, the only claim that went to trial was Thomas's original cause of action for disability discrimination.

[10] After Thomas rested, the City moved for a directed verdict. That motion was denied.

and specifically references Government Code sections 12926, subdivision (f), and 12940, subdivision (a)(1). The jury was also given the following special defense instruction: "The City has no obligation to accommodate Plaintiff if he was totally disabled and could not perform all of the essential functions required to be a police officer."

IV. *Jury*

On July 25, 2019, 15 jurors were sworn in. On August 15, 2019, alternate jurors were chosen after both parties rested, after closing arguments, and after the joint jury instructions were read. Alternates were randomly selected by drawing "because, obviously, 15 can't make the decision that 12 are required to make." The trial court erroneously informed that "Alternate Number 1 will be–Juror Number 1, Mr. Bindoy." However, Mr. Bindoy was Juror No. 2; Mr. Hernandez was Juror No. 1.

V. *Jury verdict*

Ultimately, the jury returned a verdict for Thomas on August 20, 2019, awarding him $714,000 for past economic loss, $300,000 for past noneconomic loss, and no future damages, for a total verdict of $1,014,000.

VI. *Jury poll and new deliberations/verdict*

The City requested a poll on Question No. 6[11] of the special verdict. At that point, the parties learned that Mr. Hernandez

---

[11] Question No. 6 asked the jury whether the City would have subjected Thomas to an adverse employment action had the City not been substantially motivated by his actual or perceived disability. The City does not explain why the answer to this question was so important, given the jury's findings in response to Question Nos. 1 through 5 that the City did discriminate against Thomas.

12

(Juror No. 1) had believed himself to be an alternate and not voted, while Mr. Bindoy (Juror No. 2) had voted.

The trial court corrected the roster of jurors and sent the jury back for additional deliberations and a new vote. Specifically it told the jury: "You have to go back into the jury room. Ignore the vote—this vote. Start all over again and take a vote again. [¶] Hear whatever Mr. Hernandez has to say to speak to the issues. [¶] I ask you to please return and do that." It did not explicitly instruct them to disregard the improper deliberations.

After the jury departed, the trial court and counsel discussed how this confusion could have occurred. The trial court asked the clerk to confirm the three alternates with the jury. Identifying Juror Nos. 2, 10, and 16, the trial court told the clerk: "Those should be jurors that shouldn't be deliberating, and they should start their deliberations all over again." The clerk then located blank verdict forms to give to the jurors. The trial court confirmed with counsel that this proceeding was satisfactory; defense counsel did not object.

After approximately 30 minutes, the jury returned with the identical verdict.

## VII. *The City's motion for a new trial*

### A. Motion and opposition

On December 23, 2019, the City moved for a new trial on the grounds of juror misconduct. It argued that "a non-juror participated in the deliberation process from its inception and for over two days as if he was a designated juror and then voted on the Special Verdict which was read in open court." According to the City, the alleged jury misconduct was pervasive "since it invalidated the entire deliberation over more than two days—and

13

therefore went to the very heart of the deliberation process."  And the trial court did not provide a cure.  "The only thing the jury was told here was to ignore the previous vote on the special verdict when reconvening, and no mention was made of the two days of invalid deliberation.  [Citation.]  In fact, the jury should have been required to disregard all previous deliberations—which were inherently improper and legally invalid—and anything that the misplaced alternate may have said during those deliberations.  [Citations.]  That did not happen here."

The City added:  "It is not even clear from the court's comments that the jury was instructed to begin deliberations over from the beginning.  The court's comment that the jury should 'start all over again and take a vote again' is ambiguous, particularly since the jury was not instructed to disregard any of the prior invalid deliberations.  [Citation.]  A fair reading of this comment, followed by an instruction to let the missing juror speak, would be to let him speak and then vote again, with full consideration of the improper deliberations.  Given the fast turnaround by the jury after restarting deliberations (about 30 minutes), particularly given the length of the special verdict and that the previous deliberations took over two days, it appears that the jury did rely on the improper deliberations."

Thomas opposed the motion.

B.  <u>Trial court order</u>

On February 21, 2020, the trial court denied the City's motion, finding that the jurors' conduct did not cause prejudice or result in a miscarriage of justice.  The trial court first found that the City waived any challenge to the verdict on the grounds of juror misconduct.  Defense "counsel knew about the misconduct involving the alternate juror deliberating with the other jurors

14

before the verdict. There is no evidence that he promptly objected after learning about the misconduct. Further, [defense] counsel could have immediately objected or discussed his concerns during the thirty minutes when the jury was absent and deliberating. Since the [City] did not make any prompt objection after learning about the alleged juror misconduct, the [City] waived this ground for a new trial."

Setting that procedural obstacle aside, the trial court turned to the question of whether there was juror misconduct and a resulting miscarriage of justice. It found "that there was jury misconduct because the jurors did not follow the court's instructions." In particular, "the jury did not follow the Court's instructions regarding which jurors should participate in the deliberations." But, "this misconduct was not prejudicial and did not result in a miscarriage of justice." "[W]hen the Court discovered that the alternate juror had deliberated and voted with the other jurors, the Court promptly corrected the misconduct by ordering the jurors to ignore the prior vote and to vote again. As a result, any prejudice created by the alternate juror's misconduct was not prejudicial."

Furthermore, there was no "showing that it was reasonably probable that the jury would have reached a different verdict." The fact that the second deliberation was shorter than the first deliberation was "not enough to show [that] there was jury misconduct."

VIII. *City's motion for judgment notwithstanding the verdict (JNOV)*

On December 23, 2019, the City filed its JNOV motion. It argued, inter alia, that "the evidence introduced at trial

15

established that [Thomas] was not a qualified individual and could not perform the essential functions of a police officer."

Thomas opposed the City's motion.

On February 21, 2020, the trial court denied the City's motion. After summarizing the applicable law, the trial court noted: "First, the [City's] burden of persuasion is to specify the evidence received by the jury that identified the essential functions of [Thomas's] job. The [City] must specify the evidence that identifies the essential functions because legal authority cannot define those essential functions. Each job, even those with the same employer or category of employer, differs and, as a result, the [City] must cite to the record to identify these essential functions.

"Second, if the [City] meets its burden of showing that the evidence identified the essential functions, the [City] must then show that the jury received evidence that [Thomas] was not qualified to perform those identified essential functions and that there was no substantial evidence that [Thomas] was qualified. This is necessary to show that a motion for [JNOV] should be granted on the ground that there was no evidence supporting the jury's decision.

"First, the [City] does not specify the evidence in the record that identified the essential functions of [Thomas's] position as a police officer. The [City] directs the Court to no evidence establishing the essential functions of [Thomas's] job. In the reply papers, the [City] argues that the essential functions of a police officer involve making forcible arrests and controlling and transporting suspects [citation]. However, it is improper to raise this argument for the first time in the reply and, as a result, the [City] cannot rely on this to meet its burden. [Citation.]

16

"Instead, the [City] attempts to meet its burden by focusing on the evidence that [Thomas] was unable to perform the essential functions because he 'was off work and totally disabled' [citation]. The [City] claims that, since the evidence shows that [Thomas] was unable to return to work, he was not qualified to serve as a police officer and, as a result, there can be no discrimination when it removed its police powers." In other words, the City's "argument is premised on showing that [Thomas] was totally disabled because he was not released to return to work."

The trial court went on to set forth some of the evidence supporting the inference that Thomas was qualified because he had been cleared to work, including Dr. Collins's note, Dr. Sima's note, and the e-mail exchange between two police officers confirming that Thomas had been cleared to return to work.

The trial court concluded: "When viewing the evidence in the light most favorable to [Thomas], this shows that there was substantial evidence to support the jury's finding . . . that [Thomas] was able to perform the essential job duties, i.e., that [Thomas] was a qualified individual. As a result, this is not grounds to grant a [JNOV] in [the City's] favor."

IX. *Thomas's motion for attorney fees*

A. Motion and opposition

On February 10, 2020, Thomas moved for attorney fees pursuant to Government Code section 12965, subdivision (b). He sought $3,081,273 and a multiplier of 1.75.

The City opposed Thomas's motion. In support, the City offered an expert declaration from Gerald G. Knapton (Knapton). He opined that Thomas's counsel "should not be allowed any fee recovery at this stage of the proceedings because they have not

explained the circumstances such that . . . the total fees they seek to have awarded to them would not be 'unconscionable' and in violation of the Rules of Professional Conduct, Rule 1.5." "However, *if* the Court finds that the conditions necessary for an award are satisfied, then it is my opinion that reasonable fees are no more than **$357,089.45.**"

      B. <u>Trial court order</u>

      In a 20-page order, the trial court granted Thomas's motion for attorney fees. Its detailed order sets forth the legal standards, including a summary of the lodestar method. Thereafter, it assessed Thomas's motion, finding that he "met his burden of demonstrating that the hourly rates sought for his attorneys [were] reasonable." However, it reduced the number of hours requested, ultimately awarding a reduced amount of $1,849,330.

      In so ruling, the trial court systematically addressed each of the City's challenges. For example, the trial court rejected the City's attempt to characterize Thomas's success as moderate, specifically noting that after 10 years of litigation, Thomas was awarded $1,014,000 in compensation for the City discriminating against him. "To qualify [Thomas's] success as moderate is fallacious."

      After establishing the lodestar amount, the trial court turned its attention to whether a multiplier should be applied. After summarizing and analyzing the relevant factors to determine whether a multiplier was appropriate, the trial court found that a 1.25 multiplier was appropriate. "The multiplier reflects the fact that counsel undertook a considerable amount of risk in litigating [Thomas's] case and their ultimate success in

18

doing so. A modest enhancement of 1.25 times the lodestar amount will give effect to the purposes underlying the FEHA."

Ultimately, the trial court awarded Thomas a total of $2,311,662.50.

X. *Appeal*

The City's timely appeal from the judgment, the posttrial motions, and the costs award ensued.

## DISCUSSION

I. *Thomas presented a prima facie case of disability discrimination*

The City challenges the judgment of disability discrimination against it in two manners: (1) The trial court's order denying its JNOV motion; and (2) The jury verdict.

A. <u>Standards of review</u>

The parties dispute the appropriate standard of review. According to the City, whether Thomas presented a prima facie case is a question of law.

"Recent decisional law is replete with the statement that in order to establish a prima facie case for [disability] discrimination . . . , the plaintiff must *prove* he was qualified for the position. [Citations.]" (*Quinn v. City of Los Angeles* (2000) 84 Cal.App.4th 472, 480, italics added (*Quinn*).)

"'Care must be taken in distinguishing between the "prima facie" elements of a claim for employment discrimination and the "essential" elements of the same case which the jury must decide. [¶] 'Whether a plaintiff has met his or her prima facie burden and whether or not the defendant has rebutted the plaintiff's prima facie showing, are questions of law for the trial court and not questions of fact for the jury. [¶] 'The prima facie burden that rests upon plaintiff will depend on the facts. For example, if

19

the adverse decision is a failure to hire or promote, the plaintiff has as part of his or her prima facie case, the burden of producing evidence that he or she was qualified for the employment or the promotion.'" (*Quinn*, *supra*, 84 Cal.App.4th at p. 481.)

As applied to the issues in the instant case, in order to establish a prima facie case, Thomas was required to present evidence that he was qualified to perform the essential functions of a police officer. If he failed to present that evidence, then he would not have satisfied his burden of presenting a prima facie case as a matter of law. However, if he presented evidence that he was qualified, the question becomes whether that evidence is sufficient. We review sufficiency of the evidence claims for substantial evidence if the facts are disputed and de novo if the facts are undisputed. (*Ellins v. City of Sierra Madre* (2016) 244 Cal.App.4th 445, 452.)

"'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.]' [Citation.]" (*Reynaud v. Technicolor Creative Services USA, Inc.* (2020) 46 Cal.App.5th 1007, 1015.) ""'In applying this standard of review, we 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.]" [Citation.] "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." [Citation.] We do not reweigh evidence or reassess the credibility of witnesses. [Citation.] We are "not a second trier of

20

fact." [Citation.]' [Citation.]" (*Reynaud v. Technicolor Creative Services USA, Inc., supra,* 46 Cal.App.5th at p. 1015.)

That said, "'[q]uestions of statutory interpretation, and the applicability of a statutory standard to undisputed facts, present questions of law, which [we review] de novo." (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969 (*Lui*).)

"On appeal from the denial of a JNOV motion, an appellate court must review the record de novo and make an independent determination whether there is any substantial evidence to support the jury's findings. [Citations.]" (*Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782.) In other words, "[a] motion for [JNOV] may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] . . . As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion. [Citations.]" (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)

B. <u>Relevant law</u>

To establish a prima facie case of physical disability discrimination under FEHA, the employee must demonstrate that he is disabled and otherwise qualified to do the job and was subjected to an adverse employment action because of such disability. (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 432–433, fn. 2.) The employee must establish that he is a "qualified individual," i.e., an employee who can perform the essential functions of the job with or without reasonable accommodation. (*Green v. State of California* (2007) 42 Cal.4th 254, 260–261.)

21

Government Code section 12926, subdivision (f), defines the phrase "'Essential functions'": "'Essential functions' means the fundamental job duties of the employment position the individual with a disability holds or desires.  'Essential functions' does not include the marginal functions of the position.  [¶]  (1) A job function may be considered essential for any of several reasons, including, but not limited to, any one or more of the following:  [¶]  (A) The function may be essential because the reason the position exists is to perform that function.  [¶]  (B) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed.  [¶]  (C) The function may be highly specialized  . . . .  [¶]  (2) Evidence of whether a particular function is essential includes, but is not limited to the following:  [¶]  (A) The employer's judgment as to which functions are essential.  [¶]  . . . [¶]  (C) The amount of time spent on the job performing the function.  [¶]  (D) The consequences of not requiring the incumbent to perform the function.  [¶]  . . . [¶]  (G) The current work experience of incumbents in similar jobs."  (Gov. Code, § 12926, subd. (f).)

"'Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors.'"  (*D'Angelo v. Conagra Foods, Inc.* (11th Cir. 2005) 422 F.3d 1220, 1230.)  This determination is "highly fact specific."  (*Hoskins v. Oakland County Sheriff's Dept.* (6th Cir. 2000) 227 F.3d 719, 726; see also *Lui, supra*, 211 Cal.App.4th at p. 971.)

C. Analysis

On appeal, the City does not challenge the jury's findings that Thomas suffered a disability and that he suffered an adverse employment action.  Rather, the only issue is whether Thomas

22

was a qualified individual who could perform the essential functions of his job. In raising this challenge, the City seems to be making a factual argument (i.e., there is no evidence that Thomas could perform the essential functions of his job) and a legal argument (i.e., pursuant to statute and case law, Thomas could not perform the essential functions of a police officer as a matter of law). We address each in turn.

### 1. *Factual argument*

As aptly noted by the trial court in its order denying the City's JNOV motion, Thomas presented substantial evidence that he was a qualified individual able to perform the essential functions of his job. There was evidence presented at trial that Thomas was cleared to return to work. Dr. Collins and Dr. Sima both cleared Thomas to return to work in Spring 2009. From Dr. Wilson's expert testimony, the jury could reasonably infer that Thomas could have returned to work. And, Dr. Jackson, an orthopedic surgeon, signed a workers' compensation document authorizing Thomas to return to work as a police officer as of August 14, 2009. Even Dr. Cox confirmed that Thomas could have worked modified duty as an officer in a primarily sedentary position.

Urging us to conclude otherwise, the City directs us to contrary testimony from Dr. Cox[12] and a note from Dr. Yuan, who

---

[12] The jury was properly instructed that it could believe all or part of an expert and a layperson's opinion. It was also told that it could "believe all, part, or none of a witness's testimony." (See *People v. Langley* (1974) 41 Cal.App.3d 339, 348 ["the trier of fact may reject a part of the testimony of a witness while believing other portions of his testimony"].)

did not testify at trial, that Thomas was permanently disabled and unable to perform the duties of a police officer. At best, the City offers evidence that conflicts from the evidence proffered by Thomas. And it is well-settled that a conflict in the evidence does not render it insubstantial. (See *Stephens v. County of Tulare* (2006) 38 Cal.4th 793, 804; *People v. Lawson* (1952) 114 Cal.App.2d 217, 219 ["it is not the province of this court to weigh conflicting evidence"].)

And there was evidence of the essential functions of his job, functions that Thomas could perform.[13] There was ample testimony that there were light duty options for police officers. There was an administrative floor that Costley could have assigned him to. He could have done projects that did not violate his restrictions. He could have worked in Veenstra's office. (See, e.g., *Lui, supra*, 211 Cal.App.4th at p. 973 [noting that not all police officer positions exist for the purpose of performing strenuous duties].)

Not surprisingly, the City directs us to contrary evidence, including MacArthur's testimony that, among other things, a police officer must be able to make forcible arrests, control suspects, and "transport, book, and handcuff." But, as Veenstra testified, Thomas worked in the ARCON/PT unit; he did not have to make arrests. Given that Thomas worked at ARCON/PT, the jury could reasonably infer that he did not have to engage in strenuous physical activities. (Contra, *Atkins v. City of*

---

[13] During Henderson's and MacArthur's testimonies, the City tried to admit into evidence documents listing the essential functions of a police officer. Thomas objected to the admission of these documents, and the trial court sustained the objections. The City does not challenge these evidentiary rulings on appeal.

24

*Los Angeles* (2017) 8 Cal.App.5th 696, 718 [evidence established that the essential functions of a police recruit included rigorous physical demands].)

In fact, defense counsel highlighted the functions of an instructor during his closing argument: "He's an instructor." And instructors, who teach, demonstrate, and understand safety, are "very useful." Defense counsel said nothing about MacArthur's description of the essential functions of a police officer. Under these circumstances, the jury was free to weigh the conflicting evidence in making its determination as to what the essential functions of the job were and whether Thomas could perform them.[14]

Certainly Government Code section 1031, subdivision (f), requires that peace officers "be free from any physical, emotional, or mental condition that might adversely affect the exercise of the powers of a peace officer." In light of the evidence that Thomas was cleared by his doctors to be a police officer, there is no violation of this statute.

2. *Legal argument*

Relying upon *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215 (*Raine*); *Lui, supra,* 211 Cal.App.4th 962; and *Quinn, supra,* 84 Cal.App.4th 472, the City argues that Thomas did not prove that he could fulfill all of the essential

---

[14]  While the City criticizes the trial court for declining to consider evidence first presented in its reply brief in support of the JNOV motion, it does not demonstrate, let alone argue, that the trial court abused its discretion in doing so. *(Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1538.)

functions of an LAPD officer as a matter of law.[15]  These cases are readily distinguishable.

The issue in *Raine* was whether an employer who "reassigns an employee to a temporary light-duty position to accommodate the employee's injury [has] an affirmative obligation under [FEHA] to make that temporary light-duty assignment available indefinitely once the employee's temporary disability becomes permanent."  (*Raine, supra*, 135 Cal.App.4th at pp. 1217–1218.)  The Court of Appeal held that the answer was no; the permanent accommodation sought by the employee was unreasonable as a matter of law.  (*Id.* at p. 1218.)  That is not the issue in this case.  Thomas is not arguing that the City should have made permanent the light duty assignment he sought while recovering from knee surgery.

In *Lui*, a police officer who had suffered a major heart attack retired from his position after the police department "informed him [that] there were no administrative positions available that did not require him to perform the strenuous physical activities regularly performed by patrol officers in the field."  (*Lui, supra*, 211 Cal.App.4th at p. 965.)  The officer filed a disability discrimination action, and the matter proceeded to a court trial.  (*Id.* at p. 968.)  The trial court found in favor of the defendant, and the plaintiff-employee appealed.  (*Ibid*.)  Thus,

---

[15]      While this argument was raised in the City's motion for a directed verdict and its JNOV motion, the City never asked that the jury be instructed that Thomas had to prove he could fulfill certain physical functions.  And, as set forth above, this argument was not presented to the jury in the City's closing argument.

"the key issue on appeal [was] whether the record support[ed] the trial court's finding that [certain strenuous duties were] essential functions of the administrative positions sought by [the] plaintiff." (*Id*. at pp. 968–969.) Because the plaintiff-employee did not demonstrate that the trial court's finding was unsupported by the record or contrary to FEHA, the Court of Appeal affirmed the judgment. (*Id*. at p. 969.)

Just as in *Lui*, the issue here is whether the judgment is supported by substantial evidence. And, as set forth above, it is. Nothing in *Lui* stands for the proposition that there are certain essential strenuous job functions that a plaintiff must prove in order to establish a disability discrimination claim, particularly here where the jury was not so instructed.

At best, an officer who is working full duty may be expected to perform essential strenuous job functions, such as, for example, the functions identified by MacArthur during her testimony. But as several witnesses at trial explained, there is a difference between full duty and light duty assignments. And, Thomas did not have to return to work full duty. Officers are not expected to perform like full duty officers when they are on light duty.

Finally, in *Quinn*, the plaintiff, who suffered a significant hearing impairment, was hired as a police officer as the result of a clerical error. (*Quinn*, *supra*, 84 Cal.App.4th at p. 475.) When his hearing impairment was discovered, his employment was terminated. (*Ibid*.) The plaintiff sued on the grounds that his discharge constituted illegal disability discrimination. After the defendant's motion for a directed verdict was denied, the matter proceeded to trial, and the jury found in favor of the plaintiff. (*Ibid*.) The defendant appealed, and the Court of Appeal reversed

the judgment on the grounds that the "plaintiff failed to produce evidence on a critical element of his claim: his qualification to be hired as a police officer." (*Id.* at p. 476.)

The City relies upon *Quinn*'s statement that the essential duties of a police officer "is a matter solely to be determined by the police department itself." (*Quinn, supra*, 84 Cal.App.4th at p. 482.) At the risk of sounding redundant, the parties presented evidence from LAPD officers as to what those duties were, and Thomas presented ample evidence that he was qualified to perform them.

II. *Alleged jury misconduct*

A. <u>Standard of review and relevant law</u>

Code of Civil Procedure section 657 provides that a verdict may be vacated and a new trial granted if jury misconduct "materially affect[s] the substantial rights of [a] party." (Code Civ. Proc., § 657.)

"In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. [Citation.] First, it must determine whether the affidavits supporting the motion are admissible. [Citation.] If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.] Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial. [Citations.] A trial court has broad discretion in ruling on each of these issues, and its rulings will not be disturbed absent a clear abuse of discretion." (*People v. Dorsey* (1995) 34 Cal.App.4th 694, 703–704.)[16]

---

[16] Holdings concerning juror misconduct in criminal cases may be applied in civil cases. (*People v. Hill* (1992) 3 Cal.App.4th

"[M]isconduct creates a presumption of prejudice which may be rebutted by a showing that no prejudice actually occurred." (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 255–256.) "Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the conduct, and the probability that actual prejudice may have ensued." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417.)

"In determining whether juror misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citations.]" (*People v. Schmeck* (2005) 37 Cal.4th 240, 294; *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 624–625.)

""'It is the trial court's function to resolve conflicts in the evidence, to assess the credibility of the declarants, and to evaluate the prejudicial effect of the alleged misconduct . . . . However, in reviewing an order *denying* a motion for new trial based on jury misconduct, as distinguished from an order *granting* a new trial on that ground, a reviewing court has a constitutional obligation . . . to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial. [Citations.]'" [Citations.] This court must undertake a de novo review to determine whether there was misconduct, and, if so, whether that misconduct" was prejudicial to the appellant and requires reversal of the judgment. (*People v. Cumpian* (1991) 1 Cal.App.4th 307, 311.) "Although we

16, 37–38, fn. 8, disapproved on other grounds in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5.)

29

independently review the record upon the denial of a motion for new trial based on jury misconduct, we still give deference to the trial court's discretionary determinations." (*Vomaska v. City of San Diego* (1997) 55 Cal.App.4th 905, 912.)

B. <u>Waiver</u>

As set forth above, the trial court found that the City waived its jury misconduct objection. This finding is supported by ample evidence. When the error came to everyone's attention, at no time did the City request a mistrial. The City did not object to the trial court's instruction that the properly seated jurors deliberate anew. And, it did not request further instructions after the trial court gave its instruction to begin deliberations anew. Not until the jury gave its verdict for Thomas and the City was dissatisfied with the result did the City file a motion for a new trial on the grounds of jury misconduct. (See, e.g., *People v. Russell* (2010) 50 Cal.4th 1228, 1250; *People v. Lewis* (2009) 46 Cal.4th 1255, 1308.)

C. <u>Analysis</u>

For the sake of completeness, we turn to the merits of the City's argument.

Assuming without deciding that there was jury misconduct, we agree with the trial court that the presumption of prejudice was rebutted. When the error was called to the trial court's attention, it immediately corrected the error by replacing the alternate juror with the correct juror and sending the correct jurors back to the jury room to deliberate, with Mr. Hernandez's viewpoint to be considered. We presume the jury followed the trial court's instruction, and "there is not the slightest indication in the record that they were unable to do so. While the jury reached a verdict fairly swiftly, this fact alone

30

does not tend to show prejudice." (*Brassfield v. Moreland School Dist.* (2006) 141 Cal.App.4th 67, 74.) As the error was not prejudicial, reversal is not required.

To the extent the City suggests that 13 jurors improperly deliberated, we disagree. At no time did 13 jurors deliberate. Before the jury left to deliberate for the first time, the trial court made clear that only 12 jurors were supposed to make the decision. There is no reason to think that the jury did not comply with this direction, either the first time (with the wrong alternate juror) or the second time (with the correct 12 jurors).

Relying upon *Griesel v. Dart Industries, Inc.* (1979) 23 Cal.3d 578, 583–584, overruled on other grounds in *Privette v. Superior Court* (1993) 5 Cal.4th 689, 696, the City argues that the trial court committed instructional error because it did not instruct the jury to disregard prior deliberations. We disagree. By specifically telling the jurors to "[s]tart all over again and take a vote again," that is exactly what the trial court did. (*Griesel v. Dart Industries, Inc., supra*, at p. 584; see also *People v. Renteria* (2001) 93 Cal.App.4th 552, 558 [jury must be instructed to disregard all past deliberations and begin deliberating anew]; *People v. Odle* (1988) 45 Cal.3d 386, 405–406 ["[by] instructing the jury to 'start from scratch,' the court [properly] implied [that] the jury should disregard previous deliberation"], disapproved on other grounds in *People v. Prieto* (2003) 30 Cal.4th 226, 256.)

In any event, "there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) "A defendant must also show that the error was prejudicial . . . and resulted in a 'miscarriage of justice' [citation]." (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.)

"[I]nstructional error is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citation.]" (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 580.) "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580–581.)

Applying these factors, even if the trial court had erred as the City asserts, that alleged error was not prejudicial. The jurors were instructed to "[s]tart all over again." Throughout the initial deliberations, Mr. Hernandez was present but silent. But during the second deliberations, he openly expressed his viewpoints and opinions while Mr. Bindoy remained quiet. There is no indication of any error.

III. *Attorney fees*

A. <u>Standard of review</u>

We review an order granting or denying attorney fees, as well as the amount of a fee award, for abuse of discretion. (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 148.) After all, "'[t]he "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong'"—meaning that it abused its discretion." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

"'An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason. [Citation.] It is a deferential standard of review that requires us to uphold the trial court's determination, even if we disagree with it, so long as it is

reasonable. [Citation.]'" (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 753.) "We will reverse the trial court's determination only if we find that 'in light of all the evidence viewed most favorably in support of the trial court, no judge could have reasonably reached a similar result.'" (*Bates v. Presbyterian Intercommunity Hospital, Inc.* (2012) 204 Cal.App.4th 210, 221.) In other words, "[w]e presume the fee approved by the trial court is reasonable." (*Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 743.)

The burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable. (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 98.) It is also the appealing party's burden to prove that the trial court abused its discretion. (*Ibid*.)

B. Relevant law

The fee setting inquiry in California ordinarily begins with the "lodestar," namely the number of hours reasonably expended multiplied by the reasonable hourly rate. (*PLCM Group, Inc. v. Drexler*, *supra*, 22 Cal.4th at p. 1095.) "'After the trial court has performed the calculations [of the lodestar], it shall consider whether the total award so calculated under all of the circumstances of the case is more than a reasonable amount and, if so, shall reduce the [Civil Code] section 1717 award so that it is a reasonable figure.'" (*PLCM Group, Inc. v. Drexler,* at pp. 1095–1096.) In determining "reasonable" compensation, trial courts must carefully review attorney documentation of hours expended; "padding" in the form of inefficient or duplicative efforts is not subject to compensation. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)

33

In adjusting the lodestar figure, the trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances of the case. (*Melnyk v. Robledo* (1976) 64 Cal.App.3d 618, 623–624.) Our Supreme Court has never "carved the factors used [to calculate the lodestar] into concrete or barred consideration of other relevant and nonduplicative factors; nor have the courts of appeal sought to do so." (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 40, fns. omitted.)

The value of legal services performed in a case is a matter in which the trial court has its own expertise. (*Melnyk v. Robledo*, *supra*, 64 Cal.App.3d at p. 623.)

C. <u>Analysis</u>

The City has not met its burden of demonstrating that the trial court abused its discretion. The trial court reduced the fee award from the requested amount ($3,081,273) to the lodestar amount ($1,849,300) and then applied a 1.25 multiplier to arrive at a total of $2,311,662.50. Its reasons for doing so are more than sufficiently explained in its detailed order.

1. *Alleged fees related to the 2014 mistrial*

Relying upon Knapton's expert declaration, the City argues that the trial court erroneously awarded Thomas fees incurred in connection with the 2014 trial that ended in a mistrial. Because the mistrial was the result of Thomas's counsel's "malfeasance," counsel should not be entitled to recoup these fees.

While the trial court seems to have rejected this legal argument in its order, the City cannot establish that these fees

were actually awarded to Thomas. "'[I]t is incumbent on the party who is dissatisfied with the court's calculation of the number of allowable hours to request specific findings.'" (*Taylor v. Nabors Drilling USA* (2014) 222 Cal.App.4th 1228, 1250.) But the City failed to request specific findings; thus, the City cannot conclusively establish, and we cannot find, that any fees that arguably should not have been awarded were in fact awarded.[17]

2. *Fees related to the Thomas II claims*

The City further argues that Thomas cannot recover fees for the 110.6 hours involving the *Thomas II* motion to dismiss and 371.9 hours regarding "events and proceedings" exclusively directed at *Thomas II*.

Again, due to the lack of specificity in the trial court's order, the City cannot demonstrate that Thomas was awarded attorney fees for hours expended regarding *Thomas II*. All we know is that the trial court did award plaintiff a reduced fee award given his success on his disability discrimination claim approximately 10 years after he suffered his knee injury.

3. *Multiplier*

The City argues that the trial court erred in applying a multiplier to the lodestar figure. We find no abuse of discretion. In awarding attorney fees, the trial court expressly relied upon *Ketchum v. Moses*, *supra*, 24 Cal.4th at page 1132, which reaffirmed that a trial court may employ a multiplier "based on

_____

[17]     In its reply brief, the City acknowledges that the trial "court reduced hours to the total fee award to 60% of the hours requested with only a couple of small exceptions." Because of "the global reduction in fees," the City asks that "the specific fees addressed [in its appeal be] similarly reduced." For the reasons set forth herein, we decline to do so.

35

factors including . . . the extent to which the nature of the litigation precluded other employment by the attorneys" and "the contingent nature of the fee award." (*Ketchum v. Moses*, *supra*, at p. 1132.) It then went on to explain why those two factors weighed heavily here, including the fact that Thomas's "counsel expended resources in this matter without receiving any compensation for over ten years." Because Thomas demonstrated that counsel "took on a considerable degree of risk by litigating this case on a contingency basis" and "advanced costs and spent a lot of time on the case while deferring any compensation and risking no compensation," it awarded a reduced multiplier of 1.25, largely because of "the contingency nature of the representation."

There was no abuse of discretion.

## DISPOSITION

The judgment and order are affirmed. Thomas is entitled to costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI


_____, J.
HOFFSTADT